STATE *v.* AVENT, STREETER, COLEMAN, BROWN, PHILLIPS, AND NELSON.

STATE v. JOHN THOMAS AVENT;
STATE v. LACY CARROLE STREETER;
STATE v. FRANK McGILL COLEMAN;
STATE v. SHIRLEY MAE BROWN;
STATE v. DONOVAN PHILLIPS;
STATE v. CALLIS NAPOLIS BROWN;
AND
STATE v. JOAN HARRIS NELSON.

(Filed 20 January, 1961.)

**1. Indictment and Warrant § 14—**

A motion to quash made before pleading to the indictment is made in apt time.

**2. Constitutional Law § 21—**

The right of property is a fundamental and inalienable right embracing all legal incidents appertaining, including the right to forbid trespass by others and the right to eject trespassers so long as the owner or his agent uses no more force than is reasonably necessary.

**3. Same: Innkeepers § 1—**

The operator of a privately owned restaurant operated in a privately owned building is not an innkeeper, and may accept some customers and reject others on arbitrary or personal grounds, and discriminate as to whom he will serve on the basis of race.

**4. Trespass § 9—**

The purpose of G.S. 14-134 is to protect those in possession of realty from trespassers, and the statute is concerned only with whether the land in question is in either the actual or constructive possession of one person and whether defendant intentionally entered upon the land after being forbidden to do so by the person in possession, and the statute applies to all persons coming within its purview and is not predicated upon race.

**5. Same—**

The purpose of G.S. 14-126 is to protect the person in lawful possession of realty, and under the statute a person who remains on the land of another after being directed to leave is guilty of a wrongful entry even though the original entrance was peaceful.

**6. Arrest and Bail § 3—**

An officer may arrest a person who commits a misdemeanor in his presence, including the offense of criminal trespass.

**7. Constitutional Law § 20—**

The Fourteenth Amendment to the Federal Constitution prohibits only action on the part of the several states in regard to its subject matter and does not apply to private conduct of individuals however discriminatory or wrongful.

**8. Same—**

G.S. 14-134 and G.S. 14-126 may not be held unconstitutional on the ground that they constitute State action, enforcing discrimination on the basis of race, since the statutes merely provide procedure for protection against trespassers in behalf of those in the peaceful possession of private property without regard to race, and the application of the statute in a particular instance for the protection of the clear legal right of racial discrimination appertaining to the ownership and possession of private property is not State action enforcing segregation.

**9. Same—**

The enforcement of the right of the owner or possessor of a privately owned restaurant in a privately owned building, in the absence of statute, to discriminate on the basis of race as to those he will permit to enter or remain on the premises violates no rights guaranteed by Article I, Section 17, of the State Constitution or by the Fourteenth Amendment to the Federal Constitution.

**10. Constitutional Law § 18—**

The right of free speech and assemblage are not absolute rights but are circumscribed as to time and place, and such rights do not obtain when the circumstances are such that their exercise involves a trespass.

**11. Constitutional Law § 30:   Trespass § 9—**

The failure of G.S. 14-134 to require the person in possession of private premises to identify himself does not render the statute unconstitutional on the ground of vagueness, since the statute necessarily means that the person forbidding another to enter upon the land shall be the owner or occupier of the premises, or his agent, which essential must be established in the prosecution as a matter of proof.

**12. Criminal Law § 99—**

On motion for nonsuit, the evidence is to be considered in the light most favorable to the State, and it is entitled to the benefit of every reasonable intendment thereon and every reasonable inference to be drawn therefrom.

**13. Criminal Law § 100—**

Where defendants introduce evidence, they waive their motions for nonsuit made at the close of the State's evidence, and must rely solely on their similar motions made at the close of all the evidence. G.S. 15-173.

**14. Criminal Law § 99—**

On motion to nonsuit, only the evidence favorable to the State will be considered, and defendants' evidence will not be taken into consideration except insofar as it is not in conflict with the State's evidence and tends to explain or make clear the evidence for the State.

**15. Trespass § 10—**

Evidence tending to show that each defendant, without legal or constitutional right or *bona fide* claim of right, entered the luncheonette department of a department store after having been forbidden by the manager and agent of the store to do so, and refused to leave

after request, *is held* to show an intentional violation of G.S. 14-126 and G. S. 14-134 by each defendant, the Caucasian as well as the Negro.

**16. Criminal Law § 156—**

An assignment of error to the whole charge, without any statement as to what part appellants contend is erroneous, is a broadside exception and will not be considered.

**17. Criminal Law § 154—**

An assignment of error which is not supported by an exception in the record, but only by an exception appearing in the assignment of error, will be disregarded.

**18. Criminal Law § 159—**

An exception not discussed in the brief will be taken as abandoned. Rules of Practice in the Supreme Court, Rule 28.

**19. Trespass § 10—**

Where the State's evidence tends to show an entry on the land of another after being forbidden, the burden is on defendant to show that he entered under a license from the owner or under a *bona fide* claim of right, and he must show not only that he believed he had a right to enter but that he had reasonable grounds for such belief.

APPEAL by defendants from *Mallard, J.*, 30 June 1960 Criminal Term, of DURHAM.

Seven criminal actions, based on seven separate indictments, which were consolidated and tried together.

The indictment in the case of defendant John Thomas Avent is as follows: "The Jurors for the State upon their oath presen, that John Thomas Avent, late of the County of Durham, on the 6th day of May, in the year of our Lord one thousand nine hundred and sixty, with force and arms, at and in the county aforesaid, did unlawfully, willfully and intentionally after being forbidden to do so, enter upon the land and tenement of S. H. Kress and Company store located at 101-103 W. Main Street in Durham, N. C., said S. H. Kress and Company, owner, being then and there in actual and peaceable possession of said premises, under the control of its manager and agent, W. K. Boger, who had, as agent and manager, the authority to exercise his control over said premises, and said defendant after being ordered by said W. K. Boger, agent and manager of said owner, S. H. Kress and Company, to leave that part of the said store reserved for employees and invited guests, willfully and unlawfully refused to do so knowing or having reason to know that he, the said John Thomas Avent, defendant, had no license therefor, against the form of the statute in such case made and provided and against the peace and dignity of the State."

STATE *v.* AVENT, STREETER, COLEMAN, BROWN, PHILLIPS, AND NELSON.

The other six indictments are identical, except that each indictment names a different defendant.

The State's evidence tends to show the following facts:

On 6 May 1960 S. H. Kress and Company was operating a general variety store on Main Street in the city of Durham. Its manager, W. K. Boger, had complete control and authority over this store. The store has two selling floors and three stockroom floors, and is operated to make a profit. On the first floor the store has a stand-up counter, where it serves food and drinks to Negroes and White people. The luncheonette department serving food is in the rear of the basement on the basement floor. On 6 May 1960 S. H. Kress and Company had iron railings, with chained entrances, separating the luncheonette department from other departments in the store, and had signs posted over that department stating the luncheonette department was operated for employees and invited guests only. Customers on that date in the luncheonette department were invited guests and employees.

On 6 May 1960 these seven defendants, five of whom are Negroes and two of whom (Joan Harris Nelson and Frank McGill Coleman) are members of the White race, were in the store. Before the seven defendants seated themselves in the luncheonette department, and after they seated themselves there, W. K. Boger had a conversation with each one of them. He told them that the luncheonette department was open for employees and invited guests only, and asked them not to take seats there. When they seated themselves there, he asked them to leave. They refused to leave until after they were served. He called an officer of the city police department. The officer asked them to leave. They did not do so, and he arrested them, and charged them with trespassing. The seven defendants were not employees of the store. They had no authority or permission to be in the luncheonette department.

On cross-examination W. K. Boger testified in substance: S. H. Kress and Company has 50 counters in the store, and it accepts patronage of Negroes at those 50 counters. White people are considered guests. Had the two White defendants come into the store on 4 May 1960, I would not have served them in the luncheonette department for the reason they had made every effort to boycott the store. He would have served the White woman defendant, but he asked her to leave when she gave her food to a Negro. The ob-

to serve Negroes at the luncheonette department downstairs in our seating arrangement. It is also our policy there to refuse to serve White people in the company of Negroes. We had signs all over the luncheonette department to the effect that it was open for employees and invited guests.

Captain Cannady of the Durham Police Department testified in substance: As a result of a call to the department he went to S. H. Kress and Company's store. He saw on 6 May 1960 all the defendants, except Coleman, seated at the counter in the luncheonette department. He heard W. K. Boger ask each one of them to leave, and all refused. He asked them to leave, and told them they could either leave or be arrested for trespassing. They refused to leave, and he charged them with trespassing. He knew W. K. Boger was manager of the store. He makes an arrest when an offense is committed in his presence, and the defendants were trespassing in his presence.

When the State rested its case, all seven defendants testified. The five Negro defendants testified in substance: All are students at North Carolina College for Negroes in Durham. Prior to 6 May 1960, Negroes, including some of the Negro defendants, had been refused service by S. H. Kress and Company in its luncheonette department. All are members of a student organization, which met on the night of 5 May 1960, and planned to go the following day to Kress' store, make a purchase, and then to go to the luncheonette department, take seats, and request service. The following day the five Negro defendants did what they planned.

The White woman defendant, Joan Harris Nelson, is a student at Duke University. Prior to 6 May 1960 she had not attended the meetings at the North Carolina College for Negroes for the purpose of securing service at the luncheonette department of the Kress store, though she has attended some of the meetings since then. She had been on the picket lines in front of the store. On 6 May 1960 she went into the Kress store, bought a ball-point pen, went to the luncheonette department, and took a seat. She was served, and while eating she offered to buy some food for Negroes from the North Carolina College, who were sitting on each side of her. When she was served food, no Negroes were in the luncheonette department. Mr. W. K. Boger asked her to leave because she was not invited, and was antagonizing customers. She did not leave, and was arrested.

The White male defendant, Frank McGill Coleman, is a student at Duke University. On 6 May 1960 he went into the Kress store, bought a mother's day card, joined his friend, Bob Markham, a

STATE *v.* AVENT, STREETER, COLEMAN, BROWN, PHILLIPS, AND NELSON.

Negro, and they went to the luncheonette department, and seated themselves. He asked for service, and was refused. Mr. W. K. Boger asked them to leave, telling them they were not invited guests, and he refused to do so, and was arrested. Prior to this date he had carried signs in front of the Kress store and other stores discouraging people to trade with them.

Some, if not all, of the defendants had been engaged previously in picketing the Kress store, and in urging a boycott of it, unless their demands for service in the luncheonette department were acceded to.

Jury Verdict: All the defendants, and each one of them, are guilty as charged.

From judgments against each defendant, each defendant appeals.

*T. W. Bruton, Attorney General, and Ralph Moody, Assistant Attorney General, for the State.*

*William A. Marsh, Jr., M. Hugh Thompson, C. O. Pearson, W. G. Pearson, F. B. McKissick and L. C. Berry, Jr., for Defendants, Appellants.*

PARKER, J. Each defendant — five of whom are Negroes and two members of the White race — before pleading to the indictment against him or her made a motion to quash the indictment. The court overruled each motion, and each defendant excepted. The motions were made in apt time. *S. v. Perry,* 248 N.C. 334, 103 S.E. 2d 404; *Carter v. Texas,* 177 U.S. 442, 44 L. Ed. 839; 27 Am. Jur., Indictments and Information, § 141.

At the close of all the evidence each defendant made a motion for judgment of compulsory nonsuit. Each motion was overruled, and each defendant excepted.

S. H. Kress and Company is a privately owned corporation, and in the conduct of its store in Durham is acting in a purely private capacity to make a profit for its shareholders. There is nothing in the evidence before us, or in the briefs of counsel to suggest that the store building in which it operates is not privately owned. In its basement in the luncheonette department it operates a restaurant. "While the word 'restaurant' has no strictly defined meaning, it seems to be used indiscriminately as a name for all places where refreshments can be had, from a mere eating-house and cookshop, to any other place where eatables are furnished to be consumed on the premises. Citing authority. It has been defined as a place to which a person resorts for the temporary purpose of obtaining a

STATE *v.* AVENT, STREETER, COLEMAN, BROWN, PHILLIPS, AND NELSON.

meal or something to eat." *S. v. Shoaf*, 179 N.C. 744, 102 S.E. 705. To the same effect see, 29 Am. Jur., (1960), Innkeepers, § 9, p. 12. In *Richards v. Washington F. & M. Ins. Co.*, 60 Mich. 420, 27 N.W. 586, the Court said: "A 'restaurant' has no more defined meaning, (than the English word shop), and is used indiscriminately for all places where refreshments can be had, from the mere eating-house or cookshop to the more common shops or stores, where the chief business is vending articles of consumption and confectionery, and the furnishing of eatables to be consumed on the premises is subordinate." Quoted with approval in *Michigan Packing Co. v. Messaris*, 257 Mich. 422, 241 N.W. 236, and restated in substance in 43 C. J. S., Innkeepers, § 1, subsection b, p. 1132.

No statute of North Carolina requires the exclusion of Negroes and of White people in company with Negroes from restaurants, and no statute in this State forbids discrimination by the owner of a restaurant of people on account of race or color, or of White people in company with Negroes. In the absence of a statute forbidding discrimination based on race or color in restaurants, the rule is well established that an operator of a privately owned restaurant privately operated in a privately owned building has the right to select the clientele he will serve, and to make such selection based on color, race, or White people in company with Negroes or vice versa, if he so desires. He is not an innkeeper. This is the common law. *S. v. Clyburn*, 247 N.C. 455, 101 S.E. 2d 295; *Williams v. Howard Johnson's Restaurant*, 268 F. 2d 845; *Slack v. Atlantic White Tower System, Inc.*, 181 F. Supp. 124, affirmed by the U. S. Court of Appeals for the 4th Circuit 27 December 1960, 284 F. 2d. 746; *Alpaugh v. Wolverton*, 184 Va. 943, 36 S.E. 2d 906; *Wilmington Parking Authority v. Burton (Del.)*, 157 A. 2d 894; *Nance v. Mayflower Tavern*, 106 Utah 517, 150 P. 2d 773. See 10 Am. Jur., Civil Rights, § 21; *Powell v. Utz*, 87 F. Supp. 811; and Annotation 9 Am. & Eng. Ann. Cas. 69 — statutes securing equal rights in places of public accommodation. We have found no case to the contrary after diligent search, and counsel for defendants have referred us to none.

In *Alpaugh v. Wolverton, supra*, the Court said: "The proprietor of a restaurant is not subject to the same duties and responsibilities as those of an innkeeper, nor is he entitled to the privileges of the latter. Citing authority. His rights and responsibilities are more like those of a shopkeeper. Citing authority. He is under no common-

In *Boynton v. Virginia*, 5 December 1960, 81 S. Ct. 182, 188, the Court held that a Negro passenger in transit on a paid Interstate Trailways' journey had a right to food service under the Interstate Commerce Act in a Bus Terminal Restaurant situate in the Bus Station, and operated under a lease by a company not affiliated with the Trailways Bus Company. Then the Court in the majority opinion deliberately stated: "We are not holding that every time a bus stops at a wholly independent roadside restaurant the Interstate Commerce Act requires that restaurant service be supplied in harmony with the provisions of that Act."

In *S. v. Clyburn, supra*, the defendants were tried on similar warrants charging that each defendant unlawfully entered upon the land of L. A. Coletta and C. V. Porcelli after being forbidden to do so and did "unlawfully refuse to leave that portion of said premises reserved for members of the White Race knowing or having reason to know that she had no license therefor." Coletta and Porcelli did business under the trade name of Royal Ice Cream Company retailing ice cream and sandwiches. The building in which they did business is separated by partition into two parts. One part has a door opening on Dowd Street, the other a door opening on Roxboro Street. Each portion is equipped with booths, a counter and stools. Over the Dowd Street door is a large sign marked Colored, over the Roxboro Street door is a similar sign marked White. Sales are made to different races only in the portions of the building as marked. Defendants, all Negroes, went into the building set apart for White patrons, and requested service. Coletta asked them to leave. They refused to do so, and they were arrested by a police officer of the City of Durham. All were convicted, and from judgments imposed, all appealed to the Supreme Court. We found No Error in the trial. The Court in its opinion said: "The right of an operator of a private enterprise to select the clientele he will serve and to make such selection based on color, if he so desires, has been repeatedly recognized by the appellate courts of this nation. *Madden v. Queens County Jockey Club*, 72 N.E. 2d 697 (N.Y.); *Terrell Wells Swimming Pool v. Rodriguez*, 182 S.W. 2d 824 (Tex.); *Booker v. Grand Rapids Medical College*, 120 N.W. 589 (Mich.); *Younger v. Judah*, 19 S.W. 1109 (Mo.); *Goff v. Savage*, 210 P. 374 (Wash.); *De La Ysla v. Publix Theatres Corporation*, 26 P. 2d 818 (Utah); *Brown v. Meyer Sanitary Milk Co.*, 96 P. 2d 651 (Kan.); *Horn v. Illinois Cent. R. Co.*, 64 N.E. 2d 574 (Ill.); *Coleman v. Middlestaff*, 305 P. 2d. 1020 (Cal.); *Fletcher v. Coney Island*, 136 N.E. 2d 344 (Ohio); *Alpaugh v. Wolverton*, 36 S.E. 2d 906 (Va.). The owner-

operator's refusal to serve defendants, except in the portion of the building designated by him, impaired no rights of defendants."

In an Annotation in 9 A.L.R., p. 379, it is said: "It seems to be well settled that, although the general public have an implied license to enter a retail store, the proprietor is at liberty to revoke this license at any time as to any individual, and to eject such individual from the store if he refuses to leave when requested to do so." The Annotation cites cases from eight states supporting the statement. See to the same effect, *Brookside-Pratt Min. Co. v. Booth,* 211 Ala. 268, 100 So. 240, 33 A.L.R. 417, and Annotation in 33 A.L.R. 421.

This is said by *Holmes, J.,* for the Court in *Terminal Taxicab Co. v. Kutz,* 241 U.S. 252, 256, 60 L. Ed. 984, 987, a suit to restrain the Public Utilities Commission from exercising jurisdiction over the business of a taxicab company: "It is true that all business, and for the matter of that, every life in all its details, has a public aspect, some bearing upon the welfare of the community in which it is passed. But however it may have been in earlier days as to the common callings, it is assumed in our time that an invitation to the public to buy does not necessarily entail an obligation to sell. It is assumed that an ordinary shop keeper may refuse his wares arbitrarily to a customer whom he dislikes. . . ."

None of the cases cited in defendants' brief are applicable to the situation which obtains in the instant cases. For instance, *Cooper v. Aaron,* 358 U.S. 1, 3 L. Ed. 2d 5 — public education; *Boman v. Birmingham Transit Co.,* 280 F. 2d 531 — public transportation; *Valle v. Stengel,* 176 F. 2d 697 — a case in respect to an amusement park in the State of New Jersey, which State has a statute, R.S. 10: 1-3, N.J.S.A., providing that no proprietor of a place of public resort or amusement. ". . . shall directly or indirectly refuse, withhold from, or deny to, any person any of the accommodations, advantages, facilities or privileges thereof . . . on account of race, creed or color," R.S. 10: 1-6, N.J.S.A.

"The right of property is a fundamental, natural, inherent, and inalienable right. It is not *ex gratia* from the legislature, but *ex debito* from the Constitution. In fact, it does not owe its origin to the Constitutions which protect it, for it existed before them. It is sometimes characterized judicially as a sacred right, the protection of which is one of the most important objects of government. The right of property is very broad and embraces practically all incidents which property may manifest. Within this right are included the right to acquire, hold, enjoy, possess, use, manage, . . . property." 11 Am. Jur., Constitutional Law, § 335.

G.S. 14-134 has been the statute law of this State for nearly a hundred years. It reads: "If any person after being forbidden to do so, shall go or enter upon the lands of another, without a license therefor, he shall be guilty of a misdemeanor, and on conviction, shall be fined not exceeding fifty dollars, or imprisoned not more than thirty days." Then follows a proviso as to obtaining a license to go upon land of another to look for estrays. This statute is color blind. Its sole purpose is to protect people from trespassers on their lands. It is concerned with only three questions. One, was the land in either the actual or constructive possession of another? Two, did the accused intentionally enter upon the land of another? Three, did the accused so enter upon the land of another after being forbidden to do so by the person in possession? *S. v. Baker,* 231 N.C. 136, 56 S.E. 2d 424.

G.S. 14-126 has been the statute law of this State for many years, and reads: "No one shall make entry into any lands and tenements, or term for years, but in case where entry is given by law; and in such case, not with strong hand nor with multitude of people, but only in a peaceable and easy manner; and if any man do the contrary, he shall be guilty of a misdemeanor." This statute is also color blind. Its purpose is "to protect actual possession only." *S. v. Baker, supra.* We have repeatedly held in applying G.S. 14-126 that a person who remains on the land of another after being directed to leave is guilty of a wrongful entry even though the original entrance was peaceful. The word "entry" as used in each of these statutes is synonomous with the word "trespass." *S. v. Clyburn, supra.*

The officer of the city of Durham had a right and duty to arrest all seven defendants in the luncheonette department of the Kress store, because all of them were committing misdemeanors in his presence. G.S. 15-41. There is no merit in their contention that this constituted State action denying them rights guaranteed to them by the 14th Amendment to the Federal Constitution and by Article I, § 17, of the State Constitution. *S. v. Clyburn, supra.*

Defendants in essence contend that the indictments should be quashed and the cases nonsuited because the judicial process here constitutes State action to enforce racial segregation in violation of their rights under the due process clause and under the equal protection of the laws clause of the 14th Amendment to the Federal Constitution, and in violation of their rights under Article I, § 17, of the State Constitution, and further that G.S. 14-134 and G.S. 14-126 are being unconstitutionally applied for the same purpose. Defendants misconceive the purpose of the judicial process here.

STATE v. AVENT, STREETER, COLEMAN, BROWN, PHILLIPS, AND NELSON.

It is to punish defendants for unlawfully and intentionally trespassing upon the lands of S. H. Kress and Company, and for an unlawful entry thereon, even though it enforces the clear legal right of racial discrimination of the owner. There is no merit to this contention.

The Court said in *Shelley v. Kraemer,* 334 U.S. 1, 92 L. Ed. 1161, 3 A.L.R. 2d 441: "Since the decision of this Court in the Civil Rights Cases, 109 U.S. 3, 27 L ed 835, 3 S Ct 18 (1883), the principle has become firmly embedded in our constitutional law that the action inhibited by the first section of the Fourteenth Amendment is only such action as may fairly be said to be that of the States. That Amendment erects no shield against merely private conduct, however discriminatory or wrongful." This interpretation has not been modified: *Collins v. Hardyman,* 341 U.S. 651, 95 L. Ed. 1253; *District of Columbia v. Thompson Co.,* 346 U.S. 100, 97 L. Ed. 1480.

Private rights and privileges in a peaceful society living under a constitutional form of government *like ours* are inconceivable without State machinery by which they are enforced. Courts must act when parties apply to them — even refusal to act is a positive declaration of law — , and, hence, there is a fundamental inconsistency in speaking of the rights of an individual who cannot have judicial recognition of his rights. All the State did in these cases was to give or create a neutral legal framework in which S. H. Kress and Company could protect its private property from trespassers upon it in violation of G.S. 14-134 and G.S. 14-126. There is a recognizable difference between State action that protects the plain legal right of a person to prevent trespassers from going upon his land after being forbidden, or remaining upon his land after a demand that they leave, even though it enforces the clear legal right of racial discrimination of the owner, and State action enforcing covenants restricting the use or occupancy of real property to persons of the Caucasian race. The fact that the State provides a system of courts so that S. H. Kress and Company can enforce its legal rights against trespassers upon its private property in violation of G.S. 14-134 and G.S. 14-126, and the acts of its judicial officers in their official capacities, cannot fairly be said to be State action enforcing racial segregation in violation of the 14th Amendment to the Federal Constitution. Such judicial process violates no rights of the defendants

but not against Negro trespassers and White and Negro trespassers in company. Surely, that would not be an impartial administration of the law, for it would be a denial to the White race of the equal protection of the law. If a land owner or one in possession of land cannot protect his natural, inherent and constitutional right to have his land free from unlawful invasion by Negro and White trespassers in a case like this by judicial process as here, because it is State action, then he has no other alternative but to eject them with a gentle hand if he can, with a strong hand if he must. Annotation 9 A.L.R., p. 379 quoted above; 4 Am. Jur., Assault and Battery, § 76, p. 167; 6 C.J.S., Assault and Battery, § 20, (2). This is said in 4 Am. Jur., Assault and Battery, § 76, p. 168: "Even though the nature of the business of the owner of property is such as impliedly to invite to his premises persons seeking to do business with him, he may, nevertheless, in most instances refuse to allow a certain person to come on his premises, and if such person does thereafter enter his premises, he is subject to ejection although his conduct on the particular occasion is not wrongful." It is further said in the same work, same article, § 78: "The right lawfully to eject trespassers is not limited to the owner or occupier of the premises, but may be exercised by his agent in any case where the principal might exercise the right." The motive of the owner of land in ejecting trespassers from his premises is immaterial so long as he uses no more force than is necessary to accomplish his purpose. 6 C.J.S., Assault and Battery, p. 821. White people also have constitutional rights as well as Negroes, which must be protected, if our constitutional form of government is not to vanish from the face of the earth.

This is said in an article designated "The Meaning of State Action" by Thomas P. Lewis, Associate Professor of Law, University of Kentucky, and appearing in Columbia Law Review, December 1960, Vol. 60, No. 8, in note 134, page 1122: "State court recognition of the restaurateur's private discrimination could be in the form of denial of any action against him by an aggrieved party. A related issue is the ability of the state to enforce through arrest and an action for trespass the discrimination of the private owner. None of the interpretations of Shelley (*Shelley v. Kraemer*, 334 U.S. 1, 92 L. Ed. 1161) of which the writer is aware, except Professor Ming's, *supra*, note 92 (Racial Restrictions and the Fourteenth Amendment: The restrictive Covenant Cases, 16 U. Chi. L. Rev. 203 (1949)) would extend it to this kind of case."

In *Slack v. Atlantic White Tower System, Inc., supra,* the Court said: "No doubt defendant might have had plaintiff arrested if

she had made a disturbance or remained at a table too long after she had been told that she would only be sold food to carry out to her car. But that implied threat is present whenever the proprietor of a business refuses to deal with a customer for any reason, racial or other, and does not make his action state action or make his business a state agency."

In *S. v. Cooke*, 248 N.C. 485, 103 S.E. 2d 846, the defendants were convicted and sentenced on a charge that they did "unlawfully and willfully enter and trespass upon the premises of Gillespie Park Club, Inc., after having been forbidden to enter said premises." We found no error. Their appeal was dismissed by a divided court by the United States Supreme Court. *Wolfe v. North Carolina*, 364 U.S. 177, 4 L. Ed. 2d 1650. In neither the majority opinion nor in the minority opinion was the question of State action referred to. It seems that if the United States Supreme Court had thought that the arrest and prosecution was State action, it would have reversed our decision. It seems further that the action of that Court in dismissing the appeal means that a state has the power to enforce through arrest and an action for trespass the discrimination of a private owner of a private business operated on premises privately owned.

There is no merit in defendants' contention that all the cases should be nonsuited, because the demands that they leave Kress' store, their arrest by an officer of the city of Durham, and the judicial process here, is an unconstitutional interference with their constitutional rights of free speech, and of assembly to advocate and persuade for a termination of racial discrimination.

No one questions the exercise of these rights by the defendants, if exercised at a proper place and hour. However, it is not an absolute right. The answer to this contention is given by the Court in *Kovacs v. Cooper*, 336 U.S. 77, 93 L. Ed. 513, 10 A.L.R. 2d 608: "Of course, even the fundamental rights of the Bill of Rights are not absolute. The *Saia* case recognized that in this field by stating 'The hours and place of public discussion can be controlled.' It was said decades ago in an opinion of this Court delivered by *Mr. Justice Holmes*, *Schenck v. United States*, 249 U.S. 47, 52, 63 L ed 470, 473, 39 S Ct 247, that: 'The most stringent protection of free speech would not protect a man in falsely shouting fire in a theatre and causing a panic. It does not even protect a man from an injunction against uttering words that may have all the effect of force.' Hecklers may be expelled from assemblies and religious worship may not be disturbed by those anxious to preach a doctrine of atheism. The

right to speak one's mind would often be an empty privilege in a place and at a time beyond the protecting hand of the guardians of public order."

The evidence in these cases shows that the White defendants, and most, if not all, of the Negro defendants were freely and without molestation exercising these rights upon the streets of the city of Durham. However, they had no constitutional right to exercise these rights as trespassers in Kress' store in violation of G.S. 14-134 and G.S. 14-126.

There is no merit in defendants' contention that the indictments should be quashed, and the cases nonsuited, because S. H. Kress and Company is licensed by the city of Durham to operate a retail store, and therefore racial discrimination in the store cannot be enforced. The license is not in the record before us, and there is no suggestion by defendants that the license issued to S. H. Kress and Company contained any restrictions as to whom S. H. Kress and Company should serve. The answer to this contention, showing it is without merit, is set forth in *S. v. Clyburn, supra,* in *Slack v. Atlantic White Tower System, Inc., supra,* and in *Williams v. Howard Johnson's Restaurant, supra,* and defendants' contention is overruled upon authority of those cases. In the last case the Court said: "The customs of the people of a State do not constitute State action within the prohibition of the Fourteenth Amendment."

Defendants further contend that the indictments should be quashed, and the cases nonsuited, because G.S. 14-134 is too indefinite and vague to be enforceable under the due process clause of the 14th Amendment and under Article I, § 17, of the State Constitution, in that the statute does not require the person in charge of the premises to identify himself, and in that W. K. Boger did not identify himself when he asked them not to enter the luncheonette department, and when he asked them to leave after they seated themselves. This contention is not tenable.

G.S. 14-134 necessarily means that the person forbidding a person to go or enter upon the lands of another shall be the owner or occupier of the premises or his agent, and that is an essential element of the offense to be proved by the State beyond a reasonable doubt. The statute is not too vague and indefinite to be enforceable as challenged by defendants, because it does not use the specific words that the person forbidding the entry shall identify himself. This is a matter of proof.

On a motion for judgment of compulsory nonsuit the State's evidence is to be considered in the light most favorable to the State,

and the State is entitled to the benefit of every reasonable intendment thereon and every reasonable inference to be drawn therefrom. *S. v. Corl,* 250 N.C. 252, 108 S.E. 2d 608. In our opinion, when the State's evidence is so considered, it permits the reasonable inference that all the defendants knew when W. K. Boger forbade them to go upon or enter the luncheonette department, and requested them to leave after they had seated themselves there, he was the agent of S. H. Kress and Company in charge of the store, and we so hold.

Defendants contend that all the cases should be nonsuited because the evidence is insufficient to carry the case to the jury. All defendants introduced evidence. Having done so, they waived their motions for judgment of involuntary nonsuit which they had made at the close of the State's case, and must rely on their similar motions made at the close of all the evidence. G.S. 15-173.

Considering the State's evidence in the light most favorable to the State, and not taking defendants' evidence into consideration unless favorable to the State, or except when not in conflict with the State's evidence, it may be used to explain or make clear the State's evidence, (*S. v. Nall,* 239 N.C. 60, 79 S.E. 2d 354), as we are required to do in passing upon defendants' motions made at the close of all the evidence, it tends to show that all the defendants without legal or constitutional right or *bona fide* claim of right entered the luncheonette department of S. H. Kress and Company after having been forbidden by W. K. Boger, the manager and agent of S. H. Kress and Company there, to do so, and after they had been requested by him to leave, refused to do so. The fact, that the violations by all defendants of G.S. 14-126 and G.S. 14-134 were intentional, is shown clearly by their acts, by the two White defendants and by most, if not all of the Negro defendants in urging people to boycott the Kress store, and further by the plan entered into by the Negro defendants on the night of 5 May 1960 to go the following day to the Kress store, enter the luncheonette department there, take seats, and demand service. The evidence was sufficient to carry the cases to the jury, and we so hold.

The motions to quash the indictments raise most, if not all, of the constitutional questions raised by the motions for judgments of compulsory nonsuit made at the close of all the evidence. All these questions have been considered by the Court and most, if not all, discussed in the opinion. In our opinion, and we so hold, the trial court properly overruled the motions to quash the indictments, and correctly submitted all the cases to the jury.

Defendants' assignments of error relating to the evidence are without merit, and do not justify discussion.

Defendants' assignment of error to the charge of the court to the jury is to the whole charge, without any statement as to what part of it is, as they contend, error. Such an assignment of error is too general and indefinite to present any question for decision. *S. v. Dilliard,* 223 N.C. 446, 27 S.E. 2d 85, and cases there cited. In that case the Court said: "Unpointed, broadside exceptions will not be considered. Citing authority. The Court will not go on a voyage of discovery to ascertain wherein the judge failed to explain adequately the law in the case. Citing authority. The assignment must particularize and point out specifically wherein the court failed to charge the law arising on the evidence." Further, defendants in their brief make no mention of the charge, and no exception to the charge appears in the record, except in the assignment of error. An assignment of error will be disregarded when it is not supported by an exception in the record, but only by an exception appearing in the assignment of error. *Barnette v. Woody,* 242 N.C. 424, 88 S.E. 2d 223; *Watters v. Parrish,* 252 N.C. 787, 115 S.E. 2d 1. The assignment of error as to the charge as a whole, not being mentioned, in defendants' brief is taken as abandoned by defendants. Rules of Practice in the Supreme Court, Rule 28, 221 N.C. 544; *S. v. Atkins,* 242 N.C. 294, 87 S.E. 2d 507. However, a reading of the charge, which is in the record, shows that the trial judge correctly declared and explained the law arising on the evidence given in the cases, as required by G.S. 1-180, and in particular instructed the jury to the effect that if the defendants entered the luncheonette department of the Kress store after being forbidden under a *bona fide* claim of right and if they had reasonable grounds for such belief, and refused to leave after they had been requested to do so under such claim, as they contend their evidence tended to show, then there would be no criminal responsibility, and it would be the duty of the jury to acquit all defendants. *S. v. Clyburn, supra; S. v. Fisher,* 109 N.C. 817, 13 S.E. 878. This Court said in *S. v. Crawley,* 103 N.C. 353, 9 S.E. 409, which was a criminal action for entry upon land after being forbidden: "A mere *belief* on his part that he had such claim would not be sufficient — he was bound to prove that he had reasonable ground for such belief, and the jury should so find under proper instructions from the court. *S. v. Bryson,* 81 N.C. 595." This Court said in *S. v.*

the defendant to show that he entered under a license from the owner, or under a *bona fide* claim of right. And on the question of *bona fides* of such claim, the defendant must show that he not only believed he had a right to enter, but that he had reasonable grounds for such belief. *S. v. Glenn,* 118 N.C., 1194; *S. v. Durham,* 121 N.C., 546. But where there is evidence tending to show that the defendant believed and had reasonable ground to believe in his right to enter, then in addition to his right, the question of his *bona fide* claim of right must be in some proper way considered and passed upon before he can be convicted." Defendants have nothing to complain of in respect to the charge, and their counsel evidently thought so by not mentioning the charge in their joint brief filed with us.

Defendants' motions in arrest of judgment, which the court overruled, and which defendants assign as error, are not mentioned in defendants' brief, and are taken as abandoned by defendants.

All of the assignments of error by the defendants have been considered, and all are overruled. Defendants have not shown the violation of any of their rights, or of the rights of any one of them, as guaranteed by the 14th Amendment to the Federal Constitution, and by Article I, § 17, of the North Carolina Constitution.

No error.